752 A.2d 279

Ata O. MOSHYEDI

v.

COUNCIL OF UNIT OWNERS OF ANNAPOLIS ROAD
MEDICAL CENTER CONDOMINIUM, et al.

No. 6233, Sept. Term, 1998.

Court of Special Appeals of Maryland.

April 27, 2000.

Reconsideration Denied June 8, 2000.

---

Ellen Bryant (M. Celeste Bruce and Marcus & Bonsib, on the brief), Greenbelt, for appellant.

Murray L. Deutchman, Rockville, for appellees.

Argued before DAVIS, HOLLANDER and ADKINS, JJ.

DAVIS, Judge.

This appeal arises from the denial of compensatory damages to appellant Ata O. Moshyedi by the Circuit Court for Prince George's County. Appellant sued appellee[1] Council of Unit

---

1. At the time of this appeal, the Council is the only remaining party in this action. We note that the caption for this case refers to "Council of Unit Owners of Annapolis Road Medical Center Condominium, *et al.*" However, there is no party other than the Council; therefore, through-

Owners of Annapolis Road Medical Center Condominium (Council) for failure to repair his condominium unit. His initial complaint, filed in the circuit court on January 12, 1995, requested a declaratory judgment. In May 1995, appellee filed suit against appellant in the District Court for Prince George's County for payment of past due condominium fees. Appellant prayed a jury trial and the case was removed to the Circuit Court for Prince George's County, where the case was consolidated with appellant's original action for declaratory relief. Appellant then separately filed suit against Ashgar Shaigany, president of the Council, and Richard Johnson, doing business as Richard Johnson Improvements, the contractor hired by the Council to repair the damage. That suit was also consolidated with the two prior actions.

On April 8, 1997, appellant filed an amended complaint, which restated his claim for declaratory relief and added a second count requesting both compensatory and punitive damages. The case was tried before a jury on December 8, 1998 and, at the end of appellant's case, the trial court dismissed the action against Johnson, his company, and Shaigany. It also granted appellee's motion for judgment, declaring appellant's claim for declaratory relief moot and denying him punitive damages. Appellee proceeded with its case and, at the close of all of the evidence, the court granted appellee's motion to withdraw the second count of appellant's amended complaint for monetary damages from consideration by the jury, stating it would reserve ruling on the issue following submission of post-trial memoranda by both parties. The jury proceeded to consider appellee's claim for the past due condominium fees and, on December 10, 1998, issued a verdict awarding $18,365 to appellee. On January 20, 1999, the trial court entered judgment in favor of appellee on appellant's second count for compensatory damages. Appellant then filed this appeal and presents the following question, which we rephrase as follows:

---

out this opinion, we shall refer to the Council in the singular, as appellee.

Did the trial court err in withdrawing appellant's breach of fiduciary duty claim from consideration by the jury?

Appellee asks:

Should this appeal be dismissed for failure of appellant to order the transcript of the trial below by the deadline pursuant to MD. RULE 8–411(b)(1) (2000) and under the criteria for dismissal as set forth in 8–412(d)(2000)?

We answer appellant's question in the negative; however, we vacate the judgment of the trial court and remand for further proceedings consistent with the discussion, *infra.* Additionally, we shall deny appellee's motion to dismiss.

## FACTUAL BACKGROUND

Appellant owns Unit 7 in a two-story, fourteen unit condominium complex located at 5632 Annapolis Road in Prince George's County. The complex is governed by the Council. On January 23, 1994, appellant's unit, along with three other units within the complex, sustained flood damage. Appellee's insurance claim was processed and it received payment from the insurance company to repair the damaged units and common areas. A contractor was hired to repair the units, and a check for $29,540.21 was issued jointly payable to appellee and the contractor for appellant's unit. The contractor proceeded to repair appellant's unit until February 1994, when he was informed by appellee to make only those repairs necessary to prevent further damage. The order to the contractor came from the president of the Council following an emergency meeting of appellee's Board of Directors (Board).

Appellant eventually filed suit on January 12, 1995, in the Circuit Court for Prince George's County against appellee, requesting declaratory relief. In May 1995, appellee sued appellant in the District Court for Prince George's County for nonpayment of condominium fees. Appellant requested a jury trial and the action was transferred to the circuit court, where it was consolidated with the first action. Appellant then separately filed suit against the contractor hired by the Council and the president of the Council. The suit was also

consolidated with the prior two actions and a jury trial commenced on all three actions on December 8, 1998. At the close of appellant's evidence, the trial court dismissed the action against the Council president and the contractor and granted appellee's motion for judgment, stating appellant's claim for declaratory relief was moot and appellant was not entitled to punitive damages. At the close of all of the evidence, on appellee's motion, the court withdrew the remaining claim for compensatory damages in appellant's second count of his amended complaint from consideration by the jury. The only issue submitted to the jury was appellee's claim for condominium fees owed by appellant. The jury returned a verdict in favor of appellee in the amount of $18,365. After trial, both parties submitted memoranda, pursuant to the trial judge's request and, on January 20, 1999, the trial court entered judgment in favor of appellee on appellant's claim for compensatory damages. On February 15, 1999, appellant timely filed this appeal.

## DISCUSSION

### I

Preliminarily, we shall address appellee's motion to dismiss. Appellee requests that we dismiss the present appeal because of appellant's noncompliance with Rules 8–411 and 8–412(d) to file timely transcripts of the proceedings in the trial court necessary for review upon appeal. In a previous order, we granted appellant's motion to file the transcript after reviewing appellant's response to a Show Cause Order. Subsequently, the transcript was filed with this Court. We do not perceive any prejudice to appellee, or violation as egregious as that set out in *Laukenmann v. Laukenmann,* 17 Md.App. 107, 299 A.2d 466 (1973), to warrant dismissal of this appeal based on appellant's initial failure to file the transcript on time. Accordingly, appellee's motion to dismiss is denied.

### II

Appellant asserts that the trial court committed error when it refused to allow his complaint for compensatory damages to

be submitted to the jury. Appellant contends that a fiduciary relationship existed between appellee and appellant by virtue of the Maryland Condominium Act, MD.CODE (1996 Repl.Vol.), REAL PROP. (R.P.) § 11–101, *et seq.*, and the Council's By-Laws. He argues that the jury should have been allowed to decide, based on the evidence presented at trial, if appellee breached that duty and what damages, if any, he is entitled to in light of that breach. In essence, appellant posits that his claim of breach of fiduciary duty and any damages due from that breach are not purely equitable in nature and, therefore, he is entitled to a jury determination on that issue.

The merger of law and equity in Maryland in 1984 was in no way meant to affect a party's right to a jury trial. *Mattingly v. Mattingly*, 92 Md.App. 248, 255, 607 A.2d 575 (1992). "Article 23 of the Maryland Declaration of Rights, like the Seventh Amendment of the United States Constitution, guarantees a right to a jury trial in actions at law." *Id.* at 254–55, 607 A.2d 575 (citing *Bringe v. Collins*, 274 Md. 338, 346, 335 A.2d 670 (1975)). Equity actions, on the other hand, carry no right to a jury trial. *Id.* at 255, 607 A.2d 575. Since the 1984 merger of law and equity, the courts have regularly addressed questions of legal and equitable issues in the same proceedings. Maryland courts have stated that, "when 'the existence of both legal and equitable issues within the same case requires the selection between the jury and the court as the determiner of common issues, the discretion of the trial court "is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." ' " *Id.* (citing *Higgins v. Barnes*, 310 Md. 532, 544, 530 A.2d 724 (1987) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959))).

"Accordingly, if a case presents any legal issues, even if those issues are outweighed by equitable issues, the case is to be tried to a jury unless 'the use of the jury trial itself will in some way obstruct a satisfactory disposition of the equitable claim.' " *Id.* at 256, 607 A.2d 575 (citations omitted). However, in *Fink v. Pohlman*, 85 Md.App. 106, 122, 582 A.2d

539 (1990), we explained that, when a claim for legal remedy is "inexorably intertwined with the equitable nature of the claim made and the relief sought," it is proper for the trial court to decide the issues sitting as a court of equity. Additionally, an action that is equitable in nature will not be transformed into an action at law by a party's request for a legal remedy. *Id.* at 121, 582 A.2d 539. Likewise, a legal claim will not turn into an equitable action just because a party requests an equitable remedy. *Mattingly,* 92 Md.App. at 259–60, 607 A.2d 575 (citing *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)).

■■■ The threshold determination, therefore, in deciding if the trial court erroneously withdrew an issue from consideration by the jury, is whether the claim before the court was legal or equitable. This is often difficult to ascertain, but the Supreme Court has established three factors to consider in determining whether a claim gives rise to a jury trial. *Merritt v. Craig,* 130 Md.App. 350, 362–63, 746 A.2d 923 (2000) (citing *Mattingly,* 92 Md.App. at 256, 607 A.2d 575). They are: 1) the customary manner of trying such a cause before the merger of law and equity, 2) the kind of remedy sought by the plaintiff, and 3) the abilities and limitations of a jury in deciding the issues. *Id.* at 362, 746 A.2d 923 (citing *Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). The second prong is the most important factor to be considered. *Id.* Accordingly, a determination must be made based on the above-stated factors, in addition to an historical evaluation of whether the claim is one traditionally sounding in equity or law. *Kann v. Kann,* 344 Md. 689, 713, 690 A.2d 509 (1997).

■■■ Appellee argues that appellant's claim of breach of fiduciary duty is not a recognized action in Maryland, and alternatively, that, even if it is a valid cause of action, appellant did not provide sufficient evidence at trial to prove: 1) the fiduciary relationship and 2) the damages appellant incurred. In *Kann,* the Court of Appeals refused to accept breach of

fiduciary duty as a new cause of action at law. It stated that § 874 of the Restatement (Second) of Torts

> in effect recognizes the universal proposition that a breach of fiduciary duty is a civil wrong, but the remedy is not the same for any breach by every type of fiduciary. For some breaches the remedy may be at law, for others it may be exclusively in equity, and for still others there may be concurrent remedies.

*Id.* at 710, 690 A.2d 509.

As we articulated, *supra,* the remedy sought does not define the type of action. In *Kann,* the Court held "that there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries." *Id.* at 713, 690 A.2d 509. Appellee points to this holding for the proposition that no cause of action exists for breach of fiduciary duty. However, the Court went on to say:

> This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.

*Id.* at 713, 690 A.2d 509. In its reliance on the Restatement (Second) of Torts's section entitled "Violation of Fiduciary Duty," the Court noted:

> The local rules of procedure, the type of relation between the parties and the intricacy of the transaction involved, determine whether the beneficiary is entitled to redress at law or in equity. The remedy of a beneficiary against a defaulting or negligent trustee is ordinarily in equity; the remedy of a principal against an agent is ordinarily at law.

*Id.* at 707, 690 A.2d 509 (quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt. b (1977)).

Appellant sought a legal remedy in his claim for compensatory damages, but the court did not err in treating the claim

for breach of fiduciary duty as one in equity. Additionally, we recognize that the Court of Appeals is reluctant to order reversal based on a trial court's error in its decision to choose law or equity. *Mattingly,* 92 Md.App. at 262, 607 A.2d 575. We noted, in *Mattingly,* that the three instances where the Court did reverse and remand a case alleging error for the court's choice of law or equity contained other grounds for reversal. *Id.* In the case *sub judice,* the court's decision to withdraw the issue from the jury is the only claim the parties have properly argued before us. In cases where the Court has held the trial court committed error in its choice of law or equity, the court has proceeded to resolve the case on the merits. *Id.* (citing *Mayor and Town Council of Landover Hills v. Brandt,* 199 Md. 105, 107–08, 85 A.2d 449 (1952); *Burns v. Bines,* 189 Md. 157, 164, 55 A.2d 487 (1947)).

▇▇ Appellant states that his claim for breach of fiduciary duty rests in the statute governing condominiums and the Council's By–Laws. Section 11–114 of the Maryland Condominium Act, contained in the Real Property Article, discusses mandatory insurance coverage. R.P. § 11–114. It states:

(3) If the damaged or destroyed portion of the condominium is not repaired or replaced:

(i) The insurance proceeds attributable to the damaged common elements shall be used to restore the damaged area to a condition compatible with the remainder of the condominium;

(ii) The insurance proceeds attributable to units and limited common elements which are not rebuilt shall be distributed to the owners of those units and the owners of the units to which those limited common elements were assigned; and

(iii) The remainder of the proceeds shall be distributed to all the unit owners in proportion to their percentage interest in the common elements.

R.P. § 11–114(g)(3). Section 11–114, however, is inapplicable to appellant's claim because, pursuant to Section 12(e) of the By–Laws of the condominium, "[n]o Unit (or any part thereof)

may be used for residential purposes." Real Property § 11–114(i) states: "The provisions of this section do not apply to a condominium all of whose units are intended for nonresidential use." Accordingly, the condominium By–Laws are the governing agreement and we presume from the court's decision that it correctly considered the By–Laws and not the statute.

The By–Laws provide, under Article V, Operation Of the Property, in relevant part:

Section 10. *Repair or Reconstruction After Fire or Other Casualty.* Except as hereinafter provided, in the event of damage to or destruction of the Property as a result of fire or other casualty, the Board of Directors shall arrange for the prompt repair and restoration thereof ..., and the Board of Directors or the Insurance Trustee, as the case may be, shall disburse the proceeds of all insurance policies to the contractors engaged in such repair and restoration, as provided below.

In the event of reconstruction or repair ... which shall exceed Twenty–Five Thousand Dollars ($25,000), and if the Lead Mortgagee shall so require, all proceeds of insurance shall be paid over to a trust company ... and shall be paid out from time to time as the reconstruction or repair progresses in accordance with the provisions of an Insurance Trust Agreement ..., which contains, *inter alia,* the following provisions:

. . .

(f) Upon completion of the reconstruction or repair and payment in full of all amounts due on account thereof, any proceeds of insurance then in the hands of the Insurance Trustee shall be paid to the Board of Directors, shall be considered as one fund and shall be divided among the owners of all the Units in the same proportion as that previously established for ownership of appurtenant undivided interests in the common elements, after first paying out of the share of the owner of any Unit (to the extent such payment is required by any lienor and to the extent

the same is sufficient for such purpose), all liens upon said Unit.

It was, therefore, within the province of the court to decide, and not a jury, if the By–Laws created a fiduciary relationship. Although we recognize that *Kann* addressed an express trust relating to a decedent's estate, which clearly is equitable in nature, the issues the court was required to resolve in the instant case are equally equitable in nature.

The trial judge was required to determine, as a matter of law, if the By–Laws created a fiduciary duty and, if so, whether appellant's claim created a valid cause of action. Both of these questions address issues of law and not of fact. "Ordinarily, the judge determines matters of law." *Fairfax Savings, F.S.B. v. Ellerin,* 94 Md.App. 685, 704, 619 A.2d 141 (1993), *aff'd in part, rev'd in part, Ellerin v. Fairfax Sav., F.S.B.,* 337 Md. 216, 652 A.2d 1117 (1995) (citations omitted). Appellant's claim was essentially that the Council held the insurance money in trust for the proper and prompt repair of his unit and, through its actions, the Council breached its duty as trustee of the insurance proceeds. Appellant, the supposed beneficiary of that trust, instituted the present action for the court to determine if that duty was indeed breached.

The law is settled that " 'modern courts have not permitted the beneficiary of a trust to maintain an action at law for tort against the trustee for breach of trust.' " *Kann,* 344 Md. at 703, 690 A.2d 509 (quoting 3 A.W. Scott & W.F. Fratcher, *The Law of Trusts* § 197.1, at 189 (4th ed.1988)). "[S]upervision of trusts is the province of a court of equity...." *Id.* at 701, 690 A.2d 509 (quoting *Woods v. Fuller,* 61 Md. 457, 459 (1884)). The trust in the case *sub judice* is not a matter involving an express trust, as in *Kann,* but rather an implied trust as established by the condominium's By–Laws. Nevertheless, the determination regarding the rights of appellant as the beneficiary of the money held in trust by appellee is a matter for the court to resolve in equity. We, therefore, perceive no error and hold that the judge appropriately withdrew appellant's Count Two from consideration by the jury.

## III

### A

Appellant asserts that, by reason of appellee's breach of its fiduciary duty to effectuate repairs on his unit, the statute and By–Laws entitle him to the amount of the insurance proceeds remaining in the possession of the Board after it ordered repairs on his unit to cease. As explained, *supra,* the fact that appellant's unit is commercial renders the statute inapplicable. Because the statute is inapplicable, our review of the lower court's decision not to award appellant the relief he seeks must be guided by the pertinent provisions in the By–Laws. Although the overwhelming body of law explicating the nature of condominium estates addresses residential condominiums, the concept is succinctly summarized in *Agassiz West Condominium Association v. Solum,* 527 N.W.2d 244, 246 (N.D. 1995):

The condominium form of ownership is thus based upon the principle of shared ownership and shared responsibility. *See* Hyatt, Condominium and Homeowner Association Practice: Community Association Law § 1.05(b)(1) (2d ed.1988). Because of the manner in which ownership in a condominium is structured, each unit owner, in choosing to purchase a unit, must give up certain rights and privileges which normally accompany fee ownership of property and agree to subordinate those rights and privileges to the group's interest. *See Breene v. Plaza Tower Ass'n,* 310 N.W.2d 730, 733 (N.D.1981). A condominium project functions as a quasi-government, and ... its unit owners are responsible for its administration. [The] Section ... authorizes the unit owners, or the administrative body established by the unit owners, to provide for bylaws for "the maintenance of common elements, limited common elements where applicable, assessment of expenses, payment of losses, division of profits, disposition of hazard insurance proceeds, and similar matters." When there has been a failure to comply with the condominium's bylaws, [the Statute] authorizes "an action to recover sums due for damages, injunctive relief or such

other relief as a court of proper jurisdiction may provide by the administrative body or in a proper case, by an aggrieved unit owner."

After noting that the acceptance of a deed by each unit owner "constitutes accéptance of the terms of [the Association's] declaration," the *Agassiz* Court observed:

Under Agassiz's bylaws, its affairs are governed by the board, which is responsible for all repairs and maintenance of the common elements and for the determination of the amount required for the operation, maintenance and the other affairs of the condominium, including the assessment of common expenses for repairs to common areas and the collection of the common charges from the unit owners. All unit owners are obligated to pay the common charges assessed against their unit, and the board may take prompt action to collect any common charges which remain unpaid for more than thirty days after the due date, or to foreclose the lien for common expenses . . . .

*Id.* at 246–47. Addressing the unit owner's attempt to offset condominium fees she owed because of an alleged failure of the Association to make repairs, the court, in *Agassiz*, citing several decisions holding that there is no right to withhold payment,[2] concluded:

When Solum accepted the deed to her individual unit, she agreed to accept the terms of Agassiz's bylaws. We hold she was not entitled to withhold payment of common charges or her pro rata share for insurance, because of a dispute over repairs for common areas.

*Id.* at 247.

■ The case at hand, like *Agassiz*, involves a dispute between appellant and appellee regarding repairs for which

---

**2.** *Frisch v. Bellmarc Management, Inc.*, 190 A.D.2d 383, 597 N.Y.S.2d 962, 966 (1993); *Rivers Edge Condominium Association v. Rere, Inc.*, 390 Pa.Super. 196, 568 A.2d 261, 263 (1990); *Pooser v. Lovett Square Townhomes*, 702 S.W.2d 226, 230–231 (Tex.Ct.App.1985); *see Newport West Condominium Association v. Veniar*, 134 Mich.App. 1, 350 N.W.2d 818 (1984).

appellee was responsible. The case at bar had been referred to an arbitrator and testimony was offered that the Council of Unit Owners had offered to abate portions of the condominium fees due in consideration of its failure to make the necessary repairs. From *Agassiz,* we extract two important principles: (1) that the unit owners in a condominium regime accept—and agree to be bound by—the terms of their respective condominium documents, in this case, the By–Laws; and (2) that we must, in construing the By–Laws, be mindful that the interests of the remaining unit owners in the "one fund" denoted in the By–Laws should be taken into account just as appellant was entitled to have the Council honor its obligation to perform repairs. The concept of shared ownership and shared responsibility demands no less. Simply put, all unit owners, having agreed to be governed by the By–Laws, the unit owners other than appellant are entitled to have disbursed to the general fund any insurance proceeds remaining in excess of payments made on account of the contractor, after deduction from each unit owner's share of the proceeds for outstanding liens. In our view, the same entitlement to have excess proceeds disbursed to the general fund pertains to any excess of an amount equal to the cost of labor and materials *actually* expended for the subject repairs.

## B

Pellucidly, the By–Laws place a duty on the Board to provide payment for reconstruction or repair of qualifying damage to any units. The By–Laws state in pertinent part:

... the Board of Directors shall arrange for the prompt repair and restoration thereof ... [and] shall disburse the proceeds of all insurance policies to the contractors engaged in such repair and restoration....

*Upon completion* of the reconstruction or repair *and payment in full of all amounts due on account thereof,* any proceeds of insurance then in the hand of the Insurance Trustee shall be paid to the Board of Directors, shall be considered as one fund and shall be divided among the owners of all the Units in the same proportion as that

previously established for ownership of appurtenant undivided interests in the common elements; after first paying out of the share of the owner of any Unit (to the extent such payment is required by any lienor and to the extent the same is sufficient for such purpose), all liens upon said Unit.

(Emphasis added.) According to the By–Laws, the Board is permitted to treat excess insurance funds as one fund, to be divided equally among the unit owners, only after the repairs have been completed and there has been payment in full for repairs to any damaged units. The payment to the unit owners in the aggregate presupposes that the Board has fulfilled its obligation, with respect to bills for repairs to damaged units, to pay in full "all amounts due on account thereof."

In the case *sub judice*, the Council received five checks from its insurance company after submitting a claim for the water damage sustained by four units. The amounts of the checks were based on the estimate submitted on behalf of Johnson, the contractor. According to the testimony at trial, the check amounts include:

1. $20,740.81 for Unit 5
2. $15,664.18 for Unit 6
3. $29,540.21 for Unit 7 (owned by appellant)
4. $3,712.14 for Unit 12 (this amount is the total of two checks—one for $3,395.89 and the other for $316.25)

The total amount paid by the insurance company to the Council for the damage to all of the units was $69,657.34.

The former president of the Board testified at trial that the contractor was instructed to only make repairs to appellant's unit to prevent further damage, but not to complete the repairs included in his original estimate. Additionally, he was told not to replace the carpet in Unit 6 due to an internal leak in the unit unrelated to the incident of January 23, 1994. Ultimately, the contractor was paid a total of $50,467.51, leaving $19,189.83 remaining in the Council's possession. The current president of the Board, who is also a certified public accountant and currently in charge of the Council's record

keeping, testified that the amount of insurance received by the Council, but not spent for Unit 7, totaled $15,204.08.

Appellant had asserted variously in his complaint "that in July of 1990, [he] vacated his Unit and moved his office to 7305 Hanover Parkway, Greenbelt, Maryland" after "he incurred numerous expenses related to the leaking roof"; that he "has continued to incur expenses and has advised the Board of this"; that Dr. Shaigany "indicated that the roof would be repaired, but the Contractor 'will be skipping the work on the roof which owners had not paid their dues and assessment fees' and 'failure to repair the roof at this time leaves the Unit Owners responsible to fix the problem individually in case leakage is damaging their units or their neighboring units.'" Appellant further alleged that he had "advised Ms. Morrison that his expenses had exceeded $6,000.00" and she "acknowledged that since the [appellant] had engaged workmen to work on various matters related to roof repair in the past and had incurred these expenses, that in exchange for [appellant's] prompt payment of $3,000.00, and his providing evidence of the cost of the repairs, that Annapolis Road Medical Center would agree that his account was zero." Central to our review is appellant's averment that, "in addition thereto, *the [appellant] has been required to use his own funds, to incur debt, and to arrange for the reimbursement to his tenant for his tenant's improvements, all in order to restore his premises to an acceptable condition.*" (Emphasis added.)

The foregoing constitutes appellant's averments, in sum, *inter alia,* that he has incurred numerous expenses related to the leaking roof (Paragraph 17 of Count I) and that he has been required to use his own funds for reimbursement to his tenant of the tenant's improvements to make the unit useable (Paragraph 17 of Count II).

Of course, appellant's averments in his complaint are nothing more than assertions he must prove. Our ultimate decision as to the entitlement to the insurance proceeds designated for repair of Unit 7 devolves upon the determination of

whether, accepting the concession by appellee that it had an unqualified duty to make the subject repairs, appellant was afforded a meaningful opportunity to demonstrate the cost of the repairs and who bore that cost. The trial had proceeded on the consolidated claims for declaratory judgment filed by appellant, breach of contract filed by appellee and a subsequent claim filed by appellant against Shaigany and Richard Johnson d/b/a Richard Johnson Improvements. Although payments appellant tendered and made to appellee for his unpaid condominium dues comprised most of the testimony he offered as to amounts he should have been credited regarding the repairs to his unit, he testified: "I commissioned Mr. Freeman to repair the office. At the same time one of the physicians was looking for an office and I proposed to him if he repairs [sic] he can use the office." Thereafter, the lease agreement between appellant and Dr. Lilly was received into evidence. Lost in the attempt to adjudicate the amount owed by appellant for condominium fees was any meaningful offer of proof of expenses for repair of the roof incurred by appellant or on his behalf. This issue was simply relegated to a lesser position of importance to the controversy regarding the jury's consideration of the evidence of the condominium dues appellant owed. Consequently, the trial judge, exercising his equitable jurisdiction, considered evidence offered in a proceeding in which appellant certainly had an opportunity to offer proof of his expenditures for repair of the roof, but in which the issue was subordinated to the issues undergirding appellee's claim at law and, in our view, was unduly restricted.

With respect to appellant's expenditures for repair of his unit, appellee states in its brief:

> In this case it is uncontroverted that the Unit was completely repaired.... It is also uncontroverted that it was repaired completely at the expense of the new tenant (the unit was leased "as is"). [Appellant] did not incur any expense for the repair of this unit. The unit was empty and vacant at the time of the damage and was not being used for any purpose. The new tenant leased the premises on an "as is" basis. No testimony was presented as to expenses

associated with that repair, no testimony was presented as to what portion of that repair was paid for by the tenant or by [appellant] but it is fair to assume that the tenant paid for all the repairs, and took the unit "as is".[sic] There was no testimony that the rental amount arrived at was in any way adjusted or modified as a result of the condition of the unit.... While [appellant] testified that he,[sic] "commissioned Mr. Freeman to repair the office" what actually occurred is that he reached an agreement with a Dr. Lilly, and Dr. Lilly assumed the responsibility to repair the office. [Appellant] testified that he proposed to Lilly " .... if he repairs that he can use the office." He goes on to confirm this was the way the lease was written.

Thus the unit was repaired as the statute provided and required. Dr. Lilly presumably took over possession. And [appellant] did not have to expend any sums to do that. Since the unit was repaired, the provision of the statute, (g)(2) providing for a refund to the unit owner would not be applicable.

Therefore, the provision of the statute, (d), would be applicable and the monies received by the Condominium Association and still retained by them in their accounts, would belong to the Condominium and it is to be distributed among all the owners on a pro rata basis. Annotated Code of Maryland, Real Property Article 11–114,(g)(2)(iii).[sic] Any claim that [appellant] therefore has as [sic] against these funds is only as a pro rata portion of them.

Regarding appellee's proposed construction of Section 10 of Article V of the By–Laws, it posited in its post-trial memorandum submitted to the court:

Furthermore, as to his attempt to have the condominium pay him the "unused" portion of the insurance proceeds, under the By-laws of the Condominium, introduced as [appellant's] Exhibit No. 7, specifically, Article V, Section 10, Subsection (f), "Upon completion of the reconstruction or repair and the payment in full of all amounts due on account thereof, any proceeds of insurance then in the hands of the Insurance Trustee shall be paid to the Board of Directors,

shall be considered as one fund and shall be divided among the owners of all the units in the same proportion as that previously established for ownership of appurtenant undivided interests in the common elements.".[sic] Since [appellant's] tenant fixed up the unit at no cost to him, any excess proceeds now belong to the Condominium, and must, according to the by-laws, be divided up among the owners of all the units, including [appellant], in the percentage of ownership that they owned in the condominium.

[Appellant's] claims on Count II should therefore fail because he introduced no evidence of damages and because the Condominium By-laws, which are a recorded covenant on the property, and control the actions of all members of the condominium as well as the Council of Unit Owners, require that the money be kept by the Condominium for dispersal to all the members.

Appellee has conceded that it failed to discharge its duty under the By–Laws to repair appellant's unit. Moreover, there can be little doubt that the decision to order cessation of the repairs on appellant's unit was an attempt by appellee to make payment of the condominium fees owed a condition antecedent to completion of repairs to appellant's unit. The By–Laws, however, do not provide that payment of condominium fees is a precondition to appellee's obligation to perform repairs on his unit. Without qualification, the By–Laws specifically state that "the Board of Directors *shall* arrange for the prompt repair and restoration thereof ... [and] *shall disburse* the proceeds of all insurance policies to the contractors engaged in such repair and restoration. . . ." (Emphasis added.)

The Board's duty to perform repairs is mandatory and unconditional and its refusal to do so was a breach of its fiduciary duty. Neither does the fact that another party actually completed the repairs relieve the Board of that duty imposed by the By–Laws. Having received the insurance proceeds based on a specific estimate of the costs to repair Unit 7, "disburse[ment] [of] the proceeds of all insurance policies to the contractors engaged in such repair and restora-

tion" is mandated by Section 10 of Article V of the By–Laws *before* being transmitted into "one fund" to be divided among the owners of all of the units. The Board, therefore, never fulfilled its obligation under the By–Laws to arrange for prompt repair or to pay for the needed restoration of appellant's unit. Appellee retained the right to sue and reduce the amount owed for condominium dues to a judgment and place a lien against appellant's unit, which amount could have been deducted from his proportionate share of the general fund held by appellee.

Furthermore, appellee prevailed in the case tried before the jury for the condominium fees which were due. Appellee cannot secure the relief to which it was entitled while simultaneously disclaiming responsibility for repairs it concedes it was obligated to perform. The resort to alternative arrangements to have the roof repaired was the direct result of—and caused by—appellee's unauthorized order that the repairs to the unit cease in contravention of the By-laws. Notwithstanding appellee's assertion that, "[Appellant's] unit is all fixed up and at no cost to him," appellant was legally entitled to operate his practice in a useable office and the evidence indicates he was unable to do so. Although appellee seeks to defeat appellant's claim on the basis that he has failed to prove his out-of-pocket expenditures, the equitable relief available to appellant is not restricted to "damages" recoverable at law. This is particularly true in the case at hand where the parties acknowledge that the expenditures were, in fact, made. Equity requires that, insofar as possible, the Board not be absolved of its obligation under the By–Laws because of its decision not to comply with those very By–Laws.

Having finally resorted to the course of action it should have pursued in the first instance, appellee has, in contemplation of law, resolved its dispute regarding the fees owed appellee, leaving only appellant without recourse, under appellee's submissions, for breach of the duty to repair the unit under consideration. The court was not required to articulate its reasons for denying relief to appellant; however, we cannot discern, from the record before us, whether the court adopted

appellee's position that the By–Laws required that appellant offer evidence of only *his* expenditures for repairs to the unit. Someone or some contracting company performed the repairs. The court, sitting as a court of equity, in our view, had the authority to receive evidence of the costs of materials and labor in the repair of appellant's unit and, to the extent that the amount so expended in correcting a condition for which appellee is responsible was received in the form of insurance proceeds earmarked for Unit 7, the court should have directed that that amount be remitted to appellant. Until said amount is determined and paid over, the requirement under Section 10 of Article V that "payment [be made] in full of all amounts due on account thereof," has not been satisfied and the proceeds, until such time, may not be disbursed to the general fund.

The court, sitting as a court of equity, had evidence before it that appellee did not discharge its duties under the By–Laws to conduct the appropriate repairs. Pursuant to the By–Laws, any outstanding amounts due the contractor must be paid prior to distribution of the excess proceeds to the "fund." The Council, having failed to apply those proceeds to payment of the contractor or person making the repairs, appellant is entitled to have those funds remitted to appellant for the benefit of whomever actually made repairs for which appellee would have been responsible. Accordingly, we hold that the court erred in its order that "it may not award damages to the [appellant] as prayed in the Second Count of the Amended Complaint." Moreover, it is obvious, from appellee's reliance on the statute and asseveration that there was no evidence that appellant expended his own funds to repair the unit, that there was obfuscation of the issues and the parties believed the costs of repairs borne by others could not be taken into account. We, therefore, remand this case for further findings of fact regarding the total amount expended by appellant or on his behalf for repairs to appellant's unit and the amount of the excess insurance proceeds remaining in the trust account dedicated to repairs on appellant's unit. The lower court shall issue an order directing appellee to remit funds, held on

account of Unit 7, in an amount equal to appellant's proven expenditures to appellant, pursuant to the By–Laws.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**